UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 17 CR 633 |
| vs. | ) | Judge Robert M. Dow |
| | ) | |
| JASON NAPODANO | ) | |

**GOVERNMENT'S POSITION PAPER AS TO SENTENCING FACTORS**

The UNITED STATES OF AMERICA, by its attorney, JOHN R. LAUSCH, JR., United States Attorney for the Northern District of Illinois, hereby presents its sentencing memorandum for defendant Jason Napodano. For the reasons set forth below, the government respectfully requests that the Court impose a sentence at the low-end of the advisory Sentencing Guidelines range of 12 to 18 months' imprisonment.

I. **Introduction**

Defendant was a research analyst employed at an investment research firm identified in the information as Company A, which is located in Chicago, Illinois. He specialized in writing research reports about companies in the biotechnology and pharmaceutical fields. The companies featured in defendant's reports paid Company A to have research analysts like defendant write reports about their companies. Because the companies paid for the reports, defendant and other research analysts nearly always covered the companies in a positive fashion and often recommended that investors purchase stock in the companies.

To supplement his reports, and to further his following within the biotechnology and pharmaceutical investment community, defendant also authored articles for a website where contributors could post investment research articles available to the public. Similar to his research reports, defendant's articles for this website covered companies in a positive fashion and often

recommended that investors purchase stock in the companies.

Beginning in October 2012, and continuing into June 2015, defendant began engaging in a scheme to make money by trading before and after his reports and articles. Defendant knew the date his reports and articles were going to be publicly released, and further knew that the recommendations in his reports and articles would be positive and likely to cause the stock prices of the companies to rise. In certain instances, shortly before a report or article was publicly released, defendant began purchasing stock of companies he wrote about. He then sold the stock after the report or article became public and the stock price increased. This allowed defendant to make an easy profit by buying stock of the very companies he was recommending to investors before the investors ever saw his analysis.

Defendant's actions in trading before his research reports constituted illegal insider trading in violation of the federal securities laws. Defendant owed Company A a duty not to trade based on material, non-public information he learned as part of his job. Defendant violated that duty when he misappropriated the information about the content and release date of the reports and used it to trade for his own benefit.

Defendant's trading before and after his online articles posted to the website was a more general form of fraud, as defendant falsely stated in the articles that he owned no position in the companies he wrote about and would not own any such position within 72 hours after his articles were released. Defendant knew that statement was false because of his trading before and after his articles.

This pattern of defendant's illegal trading did not happen one or two times. Instead, as detailed in Exhibits 1 and 2 to the Government's Version of the Offense, it happened dozens of

2

times over the course of nearly three years. There were 42 research reports and 58 articles that defendant traded around. Government's Version of the Offense at Exs. 1 and 2. Since many of the articles were released along with a report, some of the 58 articles overlap with some of the reports. Defendant made approximately $130,755.12 as a result of his trading around his reports and articles. *Id.* at Ex. 1.

Separate from his reports and articles, on four occasions defendant engaged in insider trading when he received material, non-public information from others, usually Bilal Basrai, a defendant charged in a separate case before Judge Durkin, 17 CR 634. Defendant made approximately $13,109.76 as a result of these trades, bringing his combined gains from illegal trading to approximately $143,000. *Id.* at Exs. 1 and 2.

Insider trading, by its nature, is driven by arrogance and greed, and is often committed by individuals just like defendant—educated, affluent, and employed in finance. It is a crime that causes significant harm to, and undermines the integrity of, our capital markets. Insider trading also fuels a belief among every day, average investors that sophisticated finance professionals and market insiders like defendant are trading against them with information that has not yet made it into the public realm.

The facts in this case are aggravated by the fact that defendant was a financial analyst. The role of a financial analyst is to provide guidance to the investing public about information related to companies, so that investors can make informed decisions about their stock purchases. The integrity of individuals who work in this profession is paramount, and a strong message must be sent that analysts who repeatedly engage in insider trading and other forms of fraud will face a stiff punishment.

3

The harm in this case is also doubled by the fact that the people defendant defrauded were the very investors that read his reports and articles and respected his opinion as an analyst. These investors had every reason to believe that defendant's coverage was free from conflict of interest, insofar as defendant disclosed in many of his reports and in all of his articles that he owed no position in the companies he wrote about. He knew that was untrue.

A sentence of incarceration is needed in this case to deter others with access to inside information from using it to illegally trade. As a result, the government recommends a sentence at the low-end of the advisory Guidelines range. Such a sentence would provide just punishment to defendant for his prolonged fraudulent conduct, promote respect for the law, and deter others, including other financial analysts, from engaging in illegal insider trading.

## II.    **Factual Background**

Defendant engaged in three types of illegal trading. First, he misappropriated for his own benefit material, non-public information he learned as part of his job at Company A, and used that information to purchase and sell stock. Second, defendant traded around articles he wrote for the website noted above, even though his articles explicitly stated that he did not own any stock of companies he wrote about and would not own any such stock for 72 hours after his articles were published. Finally, defendant traded based on material, non-public information he learned about certain companies, which information he usually obtained from Basrai.

*Company A research reports*

Defendant was employed as a Manager Director at a division of Company A. During the time period relevant to this case, Company A had policies forbidding its employees from, among other things, trading based on inside information, misappropriating confidential information, and

trading stock of companies about which they wrote reports. Evidence of the various policies are included as exhibits to the Government's Version of the Offense. *See* Government's Version of the Offense, Exs. 4-6.

These policies required that defendant maintain the confidentiality of material, non-public information he learned as part of his job, including material, non-public information about the content and release dates of his research reports. Despite these policies, and despite the duty of trust and confidence defendant owed to his employer, he traded around many of his research reports as described above.

One example of defendant's trading concerns a company called iCo Therapeutics. On February 21, 2014, defendant used his brokerage account to purchase 50,000 shares of iCo stock at prices ranging from $0.383 to $0.3950 per share. *Id.* at Ex. 9. Three days later, on February 24, 2014, defendant purchased another 25,000 shares at $0.3759 and $0.3760 per share. *Id.*

On the next day, February 25, 2014, Company A issued a report on iCo that defendant authored. *Id.* at Ex. 7. In the report, defendant recommended iCo's stock as an "Outperform." *Id.* He stated that iCo's shares were "meaningful[ly] undervalued," described the company's current market value as "bafflingly low," and said that the stock had "tremendous upside to investors." *Id.* This report specifically stated that Company A analysts were "restricted from holding or trading securities in the issuers which they cover." *Id.* at pg. 33.

On February 27, 2014, two days after his iCo report was publicly released, defendant started selling his iCo shares, and sold all 75,000 shares by March 4, at prices ranging from $0.45 to $0.4872 per share. *Id*. Defendant made a profit of approximately $5,708 on these trades.

Prior to the government's investigation in this case, defendant gave sworn testimony before

the Financial Industry Regulatory Authority, or FINRA. His testimony is attached as Exhibit 3 to the Government's Version of the Offense. When asked why he sold his iCo shares so quickly after purchasing them, defendant stated: "Because I'm not supposed to be doing what I'm doing anyway. So the quicker I can get out, the less I feel that, you know, there is risk of getting caught." Ex. 3 at pg. 240. Defendant further stated:

> I don't know. I think in February 2014, I thought that I was and still am a small-potatoes guy that was probably flying—what I was doing was wrong and probably—I'm not Raj Rajarotnam [sic]. I'm not making millions of dollars here. I made, you know, $5,000 on [iCo] Therapeutics. And I figured, you know, that I made $5,000. The policy is that I don't own the stock, I don't trade the stock. So as quickly as I could get back to not having a position, the better.

*Id.* at 241-42.

Exhibit 1 to the Government's Version of the Offense sets forth 41 additional instances where defendant engaged in similar trading before and after his research reports.

*Articles posted to website*

In addition to his duties at Company A, defendant wrote for a website in which contributors could post investment research articles. He was paid for his articles based on the nature of the article or the amount of times it was viewed. Each article that defendant wrote for this website contained some form of disclosure that defendant did not own stock in the companies mentioned in his article and would not own any such stock within the 72 hours after the article was released. Contrary to that disclosure, defendant often purchased stock in companies he wrote about in the articles and later sold that stock after his articles were released and the stock prices of the covered companies went up.

One example concerns a company called Dara Biosciences. On December 5 and 6, 2013, defendant purchased 35,000 shares of Dara stock at prices between $0.49 and $0.4950 per share.

*Id.* at Ex. 13. One week later, on December 12 and 13, 2013, he purchased another 25,000 shares at prices between $0.4869 and $0.49 per share. *Id.* On December 16, 2013, defendant wrote an article titled "Orphan Designation A Game-Changer for DARA." *Id.* at Ex. 12. In the article, defendant touted DARA's stock, noting that an FDA decision for a drug designation "may be imminent" and that "this could be an enormous positive and major catalyst for re-valuation of the shares at a significantly higher level." The last page of the article contained the following language: "Disclosure: I have no positions in any stocks mentioned, and no plans to initiate any position within the next 72 hours."

On December 16 and 17, 2013, the day of and day after his DARA article was publicly released, defendant sold all of his shares at prices ranging from $0.5350 to $0.5850 per share. *Id.* at Ex. 13. Defendant made approximately $3,434.95 as a result of his trading in DARA stock. *Id.* at Ex. 1.

Exhibit 1 to the Government's Version of the Offense sets forth 57 additional instances where defendant engaged in similar trading before and after his articles.

*Trading based on other material, non-public information*

As detailed in the Government's Version of the Offense, on four occasions, defendant engaged in insider trading when he traded based on material, non-public information he learned from others, usually Basrai. *Id.* at Ex. 2. One of those instances involved trading in the stock of a company called Invivo.

On May 1, 2014, defendant short sold Invivo stock after he received material, non-public information from Basrai that was likely to cause Invivo's stock price to decrease. Short selling consists of borrowing stock to sell on condition that the stock be repurchased and returned at a

7

later date. Short sellers make money if the stock price goes down after they borrow and sell the stock because they are able to purchase the stock in the open market for a price lower than that for which they sold it. On May 6, 2014, after the information defendant learned from Basrai was publicly released and Invivo's stock price went down, defendant purchased Invivo shares to cover his short position, resulting in profits to him of approximately $5,400. *Id.* at Ex. 17.

Just two days *before* he began short selling Invivo's stock, defendant wrote an article *touting* Invivo's stock. *Id.* at Ex. 22. This stands in stark contrast to his actions when he heard the material, non-public information about Invivo from Basrai. At that time, just two days later, defendant began betting *against* Invivo's stock.

At some point after posting his article on Invivo, it appears that some of defendant's readers suspected that he was trading around his articles. Exhibit 23 to the Government's Version of the Offense is a print-out of defendant's responses to certain posted comments. In response to a comment about his Invivo article noted above, defendant stated:

> Yzzycz,
>
> You're on thin ice here. My patience with being attacked for being a crook are [sic] wearing thin. But since you clearly do not understand how deals work, I'll explain them.
>
> Invivo hired Aegis to raise them money. This "hiring" took place weeks (or months) ago. To raise InVivo money, Aegis gets on the phone and starts calling around other investment banks to see if they want to participate. They also start calling hedge funds and buy-side investors to see if they want to participate. They also get retail brokers involved, who then start calling around to their high-net worth clients to see if they want to participate. All this is taking place DAYS before the deal is announced to the public. That's why the stock starts to go down. Public offerings are known several days before they are announced because the deal has to be marketed. It's obvious to those in the industry, or those whose phone ring often, or those who know how to read SEC filings.
>
> I'm all 3.

8

Just because YOU didn't know about it doesn't mean other people didn't know. You need to learn how things work before you start accusing people of trading on inside info. I've said about 1000-times. I DO NOT TRADE!

Clearly, defendant's response was untrue. Not only did he trade within 72 hours of his article on Invivo, he traded in a manner that was directly contrary to what he reported in his article. In his article he touted Invivo's stock, while in his trading he betted that Invivo's stock price would go down.

### III.    The Advisory Sentencing Guidelines Range

The government agrees with the Probation Department that defendant's advisory Sentencing Guidelines range is 12 to 18 months' imprisonment. The Probation Officer calculates a base offense level of eight under Guideline § 2B1.4(a) and an eight-level enhancement under Guideline §§ 2B1.1(b)(1) and 2B1.1(b)(1)(C) because defendant's gain as a result of the instant offense, stipulated offense, and relevant conduct is approximately $143,000, which is greater than $95,000 but less than $150,000. Defendant was also granted a three-level decrease for acceptance of responsibility.

### IV.    Application of § 3553(a) Factors

As part of the sentencing process, the Court is to consider the factors set forth in 18 U.S.C. § 3553(a), and impose a sentence that is sufficient, but not more than necessary, to achieve the goals of sentencing. The relevant § 3553(a) factors in this case include: (1) the nature and circumstances of the offense; (2) defendant's history and characteristics; (3) the need to reflect the seriousness of the offense, to promote respect for the law, to afford adequate deterrence, and to provide just punishment for the offense; (4) any pertinent policy statements issued by the

Sentencing Commission; and (5) the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct. The government submits that these factors weigh in favor of a sentence at the low-end of the Guidelines.

A. **The Nature of Defendant's Crime Weighs in Favor of a Sentence at the Low-End of the Guidelines**

Defendant's actions weigh in favor of a sentence at the low-end of the advisory Sentencing Guidelines range. There are several aggravating factors specific to this offense that weigh toward imposing a meaningful term of incarceration.

First, defendant's misappropriation of inside information occurred over an extended period. Defendant was not someone who obtained material, non-public information by happenstance and used it to trade on one occasion. Instead, he engaged in a long-term and deliberate plan to make money trading around his reports and articles.

Second, defendant conducted his crimes in a way that was most likely to avoid detection. Defendant had recurring access to material, non-public information. If he regularly made large trades based on the inside information he possessed, his trading would likely have been flagged as suspicious, which would have increased the likelihood that he would have been caught. So instead, defendant focused on trades that made him smaller amounts of money. This strategy was less likely to draw attention to his pattern of repeatedly trading around his reports to supplement his income.

Third, as noted above, defendant's status as a research analyst is an aggravating factor that this Court should consider. Defendant's job was to provide guidance to individuals about making stock purchases. Ironically, it was his status as a respected research analyst in the biotechnology and pharmaceutical fields that allowed him to perpetrate this fraud, as the more followers and readers he had, the more likely his reports and articles were to be well received and cause stock

10

prices to increase.

Finally, the Court should consider as aggravating the fact that defendant engaged in a variety of different types of illegal trading. Not only did he trade before and after his research reports issued through his employer, but he also traded before and after his website articles and even traded when others, including Basrai, funneled material, non-public information to him. It paints the picture of a man who has no qualms about engaging in fraudulent conduct in order to make money.

In his own sentencing filing, defendant asks for a sentence of probation, arguing, among other things, that: (1) the government's gain calculation overstates both the amount of his gain and the severity of his offense; (2) there is no identifiable victim of his crime; and (3) the collateral consequences of his conviction have sufficiently punished him. None of these arguments support the sentence defendant seeks.

The government disagrees that the gain calculation in this case results in a Guidelines range that overstates the severity of the offense. In fact, if anything, the opposite is true. The Guidelines put the focus for insider trading cases on the gain derived from the offense. In most cases, that makes sense, as gain often is an accurate barometer of a defendant's conduct and overall culpability.

In a case like this one, however, the most aggravating measure is not defendant's gain but instead the number of times he engaged in illegal insider trading. Defendant repeatedly engaged in insider trading but made only modest amounts when doing so. As argued above, that was by design so that it was less likely defendant's trading in these often thinly traded securities would be flagged as suspicious. In this respect, the Guidelines range understates the severity of defendant's

11

offense because it does not take into account the frequency of his illegal conduct. Defendant should not be considered less culpable than someone who stumbles upon material, non-public information by happenstance and uses it to trade big, thereby making himself more likely to be caught.

In connection with this argument, defendant also claims his reports had limited circulation and were essentially only available to subscribers and through a subscription service called First Call. Defendant supports his argument by reference to data from one month—May 2015. This argument runs contrary to defendant's sworn testimony before FINRA, which is attached as Exhibit 3 to the Government's Version of the Offense. In his testimony, defendant noted that his reports had "broad distribution," including (1) "institutional platforms on Reuters, First Call, Bloomberg, Capital IQ, Perching Square, LPL"; (2) "retail brokerage platforms on Zacks Trade, Fidelity, Interactive Brokers, Ameritrade," and (3) distribution relationships with Zacks.com, Yahoo Finance, and Seeking Alpha. Government's Version of the Offense, Ex 3 at 37-38.

Defendant also argues that the lack of identifiable victims is a relevant factor supporting his request for probation. He points out that the government has taken the position in his plea agreement that identifying victims for restitution purposes would be too cumbersome on the sentencing process. That position, however, is directly endorsed by the Guidelines, *see* U.S.S.G. § 2B1.4, Background, and should not be read to mean that there are no victims here. There are many victims of defendant's crime, including defendant's employer, from whom he misappropriated confidential information, the individuals on the other end of defendant's trades, and many of the readers of defendant's articles.

Defendant's argument regarding the collateral consequences of his conviction also does not support his requested sentence. The collateral consequences defendant identifies, including

12

loss of his savings, damage to his professional reputation, civil actions in which he was ordered to pay a total of $305,351.83, and being permanently banned from involvement in penny stock offerings or promotions, do not support a sentence of probation that would be a 100% deviation from the advisory Guidelines. The consequences defendant describes are similar to those faced by every white-collar defendant, and do not serve as an individualized mitigating factor related to defendant that is entitled to substantial weight. If these consequences were given significant weight in every case, no white-collar defendant would serve jail time. That is directly contrary to policy statements in the Guidelines about how white-collar defendants should be treated. *See* Guideline Chapter 1 Part A, introductory comment 4(d).[1]

Based on the above, the nature and circumstances of the offense weigh in favor of a sentence at the low-end of the advisory Guidelines.

## B.    Defendant's History and Characteristics Further Weigh in Favor of a Sentence at the Low-End of the Advisory Guidelines Range

The PSR sets forth in detail defendant's history and characteristics, including aspects of defendant's employment, his childhood, and his family situation. Nothing in the PSR begins to explain why defendant chose to repeatedly engage in illegal trading.

At the time of this offense, defendant had a good job at Company A that paid him $25,000

---

[1] Guidelines Chapter 1, Part A, introductory comment 4(d) provides, in part, as follows:

Under pre-guidelines sentencing practice, courts sentenced to probation an inappropriately high percentage of offenders guilty of certain economic crimes, such as theft, tax evasion, antitrust offenses, insider trading, fraud, and embezzlement, that in the Commission's view are "serious."

The Commission's solution to this problem has been to write guidelines that classify as serious many offenses for which probation previously was frequently given and provide for at least a short period of imprisonment in such cases. The Commission concluded that the definite prospect of prison, even though the term may be short, will serve as a significant deterrent, particularly when compared with pre-guidelines practice where probation, not prison, was the norm.

*per month.* PSR at 12. He is highly educated, with an undergraduate degree in Biochemistry from Virginia Tech and an MBA from Wake Forest University. *Id.* at 11. Both during and after his criminal conduct, defendant also had a stable family life. All of this points to the inescapable conclusion that there was absolutely no reason, financial or otherwise, for defendant to turn to a life of crime other than greed and an arrogant belief that he would not be caught. That is an aggravating factor the Court should consider. *See, e.g.*, *United States v. Anderson*, 517 F.3d 953, 966 (7th Cir. 2008) (noting that district court considered that defendant was "well off financially and could have relaxed and enjoyed his golden years" and that "[w]hile many criminals commit crimes from lack of opportunity and desperation, [defendant] acted out of greed.").

In mitigation, defendant agreed to resolve this case via an information, pled guilty in a timely fashion, and promptly accepted responsibility for his actions. He also attempted to cooperate by proffering with the government. The government viewed defendant as being truthful in his proffer, but the information he provided was not useful enough to the government to be considered substantial assistance. The Court should consider these mitigating facts in imposing a reasonable sentence, but must weigh them against the seriousness of this crime and other aspects of defendant's history and characteristics.

**C.    A Sentence at the Low-End of the Advisory Guidelines Range Will Provide Adequate Deterrence to Others**

The need to afford adequate deterrence to others is a critical part of the sentence to be imposed in this case for a number of reasons. First and foremost, defendant is the exact type of defendant and committed the exact type of crime where general deterrence matters. Insider trading is a crime most often committed by affluent and well-educated defendants. In this case, as in most insider trading cases, it was not a crime of need or passion. Crimes of this nature can be deterred

14

with punishment that includes meaningful terms of incarceration. Other would-be defendants who are thinking about using their positions of trust to misappropriate material, non-public information will think twice if they believe their actions will have serious consequences. These consequences cannot be simply disgorgement of ill-gotten gains or the payment of fines. Instead, the consequences need to include depriving wrongdoers of their liberty to be effective in deterring others.

Similarly, insider trading cases can be difficult to detect and prove, and lucrative to the participants. Thus, it is important that sentences in this and other fraud cases serve to deter individuals from committing the same crime. *See United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it.").

A sentence at the low-end of the advisory Guidelines range in this case would deter others from committing fraud, promote respect for the law, and would provide just punishment for defendant. Such a sentence would be a strong message to defendant and other would-be insider trading defendants that their conduct is serious and will be punished accordingly.

### D.    The Need to Avoid Unwarranted Sentencing Disparities

Under 18 U.S.C. § 3553(a)(6), the Court is to consider the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct. To the extent the Court believes that avoiding unwarranted sentencing disparities under § 3553(a)(6) is a factor entitled to significant weight, then it should impose a Guidelines sentence. *See, e.g.*, *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009) ("The best way to

curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly.").

In his sentencing memorandum, defendants argues that his requested sentence of probation is consistent with insider trading sentences imposed in other districts. However, it is impossible to tell from the information provided whether defendant's case is really comparable to the ones set forth in defendant's sentencing filing. A review of those cases appears to show that at least some of the defendants engaged in insider trading only once, and thus were not like defendant, who repeatedly accessed inside information and traded on it numerous times. Moreover, some of the defendants in the cases cited appear to have been tippees who received inside information from someone else. That is not defendant. These cases do little to support defendant's position that a sentence of probation is needed to avoid unwarranted sentencing disparities.

Significantly, the last three criminal insider trading cases to result in sentences in this district support the government's view that a sentence at the low-end of the Guidelines is appropriate here. The last three insider trading sentences from this district were in *United States v. Basrai*, 17 CR 634 (Judge Durkin), *United States v. Dombroski*, 14 CR 41 (Judge Ellis), and *United States v. Flanagan*, 12 CR 510 (Judge Dow).

In the *Basrai* case, the defendant received a sentence of 2 years' probation from Judge Durkin. (17 CR 634, Docket #19.) He is not, however, similarly situated to defendant. Basrai engaged in insider trading on three occasions and made approximately $37,157. (*Id.* at Docket #10, pg. 9.) He also received a 5-K motion from the government based on substantial assistance he provided. (*Id.* at pg. 11-12.) By contrast, defendant engaged in insider trading on many more occasions, made substantially more money, and is not receiving a 5-K.

16

In *Dombroski*, Judge Ellis sentenced the defendant to one year and one day of imprisonment. (14 CR 41, Docket #50.) The defendant in that case made $286,211 by shorting stock and purchasing put options of the company for which he worked in advance of a negative earnings announcement. (*Id.* at Docket #28.) He engaged in insider trading only once. The defendant pled guilty pursuant to a plea agreement with the government, but did not receive a 5-K motion. (*Id.*) His Guidelines range, at least as reflected in his plea agreement, was 24 to 30 months' imprisonment. (*Id.* at pg. 9.)

Finally, in *Flanagan*, Your Honor sentenced the defendant to 21 months' imprisonment. The defendant was a partner at a large accounting firm. (12 CR 510, Docket #17.) As part of his position, Flanagan obtained inside information about some of the accounting firm's clients, and he used that information to purchase and sell stock. (*Id.*) He repeatedly engaged in insider trading and made profits totaling approximately $478,000. (*Id.*) Flanagan pled guilty and agreed to be charged via an information. (*Id.*) His Guidelines range, at least as set forth in the plea agreement, was 37 to 46 months' imprisonment. (*Id.* at pg. 21.)

While it is difficult to truly compare defendants because each case and each defendant presents factors that are different and that are not necessarily reflected in the materials available in the public record, the sentences imposed in the *Dombrowski* and *Flanagan* cases are insightful when compared with the defendant's recommended sentence of probation. Plainly, the conduct in *Flanagan* seems more egregious than the conduct in *Dombrowski*, and worthy of a stiffer punishment. Putting the issue of gain to the side, defendant's conduct is more similar to that in *Flanagan* than *Dombrowski*.

Defendant engaged in insider trading not once but dozens of times. The defendant in

*Dombrowski* did so on one occasion, and was still sentenced to essentially the same prison sentence the government seeks against defendant. While the defendant in *Dombrowski* made more money than defendant, as noted above, the gain cannot be the only measure of culpability in cases like this one. To say that a defendant such as Dombrowski is more culpable or his conduct more egregious because he made more is to ignore the distinction between an insider trading defendant who engages in illegal conduct because they obtain inside information by happenstance on one occasion, like Dombrowski, and an industry professional who repeatedly engages in illegal insider trading in a way to minimize the probability that he would be caught, like defendant.

As the above analysis shows, any consideration of sentences in other insider trading cases in this district weighs in favor of the government's recommended sentence. A sentence of probation, as defendant asks, would be flatly inconsistent with sentences imposed in other insider trading cases.

**V.     Conclusion**

For the reasons stated above, the government respectfully asks that the Court sentence defendant at the low-end of the advisory Sentencing Guidelines range.

Respectfully submitted,

JOHN R. LAUSCH, JR.
United States Attorney

By:     /s/ Jason A. Yonan
        JASON A. YONAN
        Assistant U.S. Attorney
        219 South Dearborn St., Rm. 500
        Chicago, Illinois 60604
Dated: June 5, 2018          (312) 353-0708

18